[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Petitions to terminate parental rights of the mother in CT Page 9448 Tonney (born 12/5/85), Oscar (born 11/21/84) and Ginger (born 8/24/83) were filed in this court in August, 1996. The Department of Children and Families (DCF) took custody of seven siblings including Tonney, Oscar and Ginger under an Order of Temporary Custody on September 28, 1990. On December 6, 1990, the seven children were adjudicated neglected, and Tonney, Oscar and ginger were committed to DCF custody. Commitment has been extended three times, so they remain in state foster homes and have never been returned to the custody of mother. The father is deceased. The petitions to terminate are granted.
Petitions to terminate parental rights in six children including Tonney, Oscar and Ginger was filed in October, 1992. After a partial trial, the court dismissed the petitions without prejudice on January 14, 1993. The transcript of the dismissed, proceedings confirms no adjudicatory findings were made; the state conceded that no clear and convincing evidence was available for the dispositional phase to show therapeutically that termination would have been in the children's best interest. The mother's revocation petition was denied without prejudice. Inre John B., 20 Conn. App. 725 (1990). Either party could refile. The mother now has a different attorney.
The family is revisited for possible termination some four years later.
 I.
All three current termination petitions allege four grounds in statutory language extending over at least one year: 1) abandonment 2) failure to rehabilitate 3) acts of commission or omission and 4) no on going parent child relationship. General Statute § 17a-112. The earlier termination petitions alleged two grounds: abandonment and failure to rehabilitate.
This trial itself was in two parts. The mother failed to appear for trial at the scheduled time. Her attorney reported repeated unsuccessful attempts to contact the client; there had been no contact from the mother from March 1996 although the mother knew of judicial involvement with her children. Without any explanation for the absence of the mother, the court denied a motion for continuance and conducted a testimonial hearing with all attorneys present.
At the beginning of this hearing the court advised the CT Page 9449 participants without objection that judicial notice would be taken of the petition, Summary of facts, Social Study, partial transcript of the prior termination proceeding and Dr. Freedmans court ordered evaluation and addendum of 1995. In re Mark C.,28 Conn. App. 247 (1992). All documents were familiar to the attorneys. Testimony of the first hearing was given by the DCF social worker. Court heard arguments from counsel.
Subsequent to the hearing, the mothers attorney reported a trial date office answering machine message from the mother about her lack of transportation. Not knowing if the recorded message had been timely received by the attorney, the mother, familiar with the juvenile system, should have phoned either the court or DCF. Considering, however, the nature of termination, the court reopened the hearing to allow the mother to testify as was her original plan for the hearing.
 II.
The interest of parents in their children is a fundamental constitutional right that "undeniably warrants deference and, absent a powerful countervailing interest, protection." Stanleyv. Illinois, 405 U.S. 645, (1972); while the parent has an interest in family integrity, the child has an interest in safety and stable family environment. In re Juvenile Appeal (83-CD),189 Conn. 276, 285-287 (1983). Termination can not be based solely on parents who are not model parents or who have lost custody. The court does not terminate on a comparison of parenting capability.In re Jessica M., 217 Conn. 459, 465-467 (1991). The standard of proof for state intervention is clear and convincing evidence and consideration of the childs' best interest requires proof first of a statutory ground. In re Valerie D., 223 Conn. 492, 511
(1991); Practice Book, Chapters 38A, 39A.
 III.
The forty two year old mother, born in North Carolina, has given birth to twelve children. She moved to Connecticut in 1984 where she soon became involved with DCF on referrals. She left behind an extensive history of abuse and neglect. In Connecticut, DCF received continual reports from school authorities that the mother was physically abusive and left her children, including Ginger, Oscar and Tonney, unattended. A neglect petition involving ten children, including Tonney, Oscar and Ginger, was filed in court in December 1988; by agreement the children were CT Page 9450 adjudicated neglected and the court ordered protective supervision. § 17a-93 (i). After the protective supervision order had expired, a new neglect petition for May 1990 was filed; based on a plea of nolo contendere, the court again ruled the children were neglected and ordered protective supervision. In September 1990, DCF custody was granted for the ten children, and for the third time the children were adjudicated neglected.
While several of the children have returned home from DCF custody, the three children involved in this petition have remained in DCF non-relative foster care over six years. At time of removal, Tonney was almost five years old, Oscar was six years old and Ginger was seven years old, so approximately half of their lives has been spent in foster care.
While written expectations apparently were not set by the court, on December 6, 1990 the judge advised the mother in court to enroll and receive assistance from a local parent aide program, but, whatever the specifics, DCF efforts have been unsuccessful.
As an aid to develop appropriate support services, various evaluations have been made to DCF. The mother has been characterized as "immature and dependent in that she fails to recognize her responsibility to care for her children . . . she uses poor judgment concerning her own well-being and that of her children", Milford Mental Health Center (1991). She tries "to ignore or minimized the impact of everyday pressure of living in a complex society", Hopson Center (1992). The mother's "protocol matched those of persons with severe personality disorders who may have an anti-social or a paranoid personality, or a paranoid disorder", Mantell (1992). Social Study for Termination, dated July 29, 1996, pages 5, 6. Mother has a police record and has been incarcerated. Dr. Mantell was "stunned by the sheer weight of the social history documented in these records." Statement of Facts, Termination Petition, August 5, 1996. Nevertheless, these evaluations are not sufficient basis to terminate parental rights. The test is behavioral, the ability to function as a parent. In re Nicolina T., 9 Conn. 598 (1987); In re David E.,4 Conn. App. 653 (1985).
The transcript of the hearing on January 14, 1993 contains a ruling by the trial judge that DCF need make no further efforts at family physical reunification although visitation might occur in accordance with a therapist recommendation. ". . . DCF has, CT Page 9451 over the time of its involvement, offered services to the family to attempt to reunite the children with the mother". Transcript, January 14, 1994, page 3. The ruling authorized indefinite foster care with the mother responsible for initiating reunification attempts. The mother was advised to review treatment plans and was allowed direct access to the therapist for these children.
When family reunification efforts are not possible or appropriate, the court can approve a permanent plan for the child so as to maintain federal foster care assistance. Title IV-E of Social Security Act contained in P.L. 96-272 (codified as 42 U.S.C. § 671
and 672).
Following the 1993 decision, DCF did authorize four visits per year coordinated by the agency. No requests for visits were made. DCF concedes the mother has made some visits, but sporadically without notice. The court does not find credible the mother's claim of consistent weekend visits with Ginger and the two boys in 1995. The mother concedes she has not arranged visitation with her three children in 1996, and made her last phone call in May 1996. The mother's excuse was undefined "personal problems"; the foster homes have always been open for visitation by the mother. She did see Ginger for about fifteen minutes in the summer of 1996 when being transported by a DCF worker to a different destination. When the mother was incarcerated at Niantic in 1996, DCF arranged two visits. DCF has a visitation reimbursement transportation program as DCF workers generally transport only for court appearances.
The mother claims some individual counselling in 1994 and a month long program in parenting in 1994. She has no documentation of the coverage or success of those efforts. The mother asserts DCF declined to provide assistance, but, despite the first termination ruling, DCF in 1994 decided to explore reunification rather than leave the children in the uncertainty of long-term foster care. Follow up efforts were unsuccessful or uncorroborated. The mother failed to attend treatment plan reviews and has been lax in maintaining contact with DCF.
On June 1, 1995, the undersign ordered a DCF review of whether indefinite foster care or termination was in children's best interest. The mother declined to participate in the evaluation. While mother was a prisoner, an Administrative Case Review was held at the prison on March 26, 1996 when mother declined monthly visits, on-going phone call, and pictures of her children. If visitation CT Page 9452 and contact was the door for possible reunification, the mother refused to step over the threshold.
The mother does not acknowledge the children's birthdays. She was unsure of the age or school grade of Ginger and was uncertain how long the children have been separated from her. She never requested any school records.
The mother lacks an ability to responsibly parent her children. See Termination Study addendum, October 23, 1992, for example.
Despite three judicial findings of neglect and her passive role toward her children, the mother objects to termination and insists the children do not need foster care as she can take better care of the children at this time than any foster parent; she "knows" her children. She currently rejects parenting classes but concedes there might be some new "current" issues.
The mother has a passive response to state intervention. She expects her children to flock to her under some primal biological urge for maternal contact, and some have.
 IV.
A. Ginger is now thirteen. She has been in the same foster home since February 1991, almost six years. She studies at a B and C level, utilizing special education, only for language. Ginger plays basketball and is also a cheerleader. She is a church member and participates in choir. After about twenty months in sibling groups sessions, the therapist did note that Ginger has idealized memories of past life with mother and has a strong sense of family loyalty regardless of reality. Ginger has a blind loyalty to her mother despite the lengthy separation; she has good memories of her mother without any awareness of abuse or neglect. In the summer of 1995, Ginger might have considered an open adoption. The foster parents are willing to adopt. Ginger concurs but in presence of mother declined adoption in favor of return.
In November 1994, mother visited without advance notice at the foster home — no other contact in that year. The mother ignored 1994 Christmas. In March 1995, mother stopped by when she was visiting Foxwood; there was a visit at mother's home in November 1995. There were two 1995 phone calls including an CT Page 9453 unkept promise to attend the child's birthday. Dr. Freedman, the evaluating psychologist, recommended termination.
B. Oscar is now twelve. Oscar resided in the same foster home since September 28, 1990 to the end of summer 1996. Oscar spoke to mother in December 1995 and visited his mother twice in 1996 at prison.
In the summer of 1994 he spent six weeks in the Elmcrest Partial Hospitalization Program but now shows signs of healthy emotional and social development. Oscar is a member of the church junior choir, receives high marks in school and community. Oscar is probably the best adjusted of these three children. He repeatedly requested an open adoption by his foster mother even though he loved his mother. Dr. Freedman recommended termination. Unfortunately, the long time foster mother recently died. He is now in a new foster home with his brother. Oscar is adoptable.
C. Tonney is eleven. He has one kidney and required an operation to correct a testicular problem. Tonney has been in his third foster home since May 1994. Prior, he was in the same foster home for four years. In 1995, Tonney began individual therapy. His therapist reports the child had fantasy thoughts about his mother and former home life. Exhibit M-2 (June 27, 1995).
Tonney has seen his mother in December 1994 and March 1996 (prison visit). They had a phone conversation in January 1995. Tonney's strong sense of loyalty to his mother may have been encouraged by his older sister who has a history of out of control behavior and truancy. Tonney's medication has controlled his behavior and the foster mother provides adequate structure or guidance which can head off a turbulent adolescence or delinquency.
Dr. Freedman did not recommend reunification. Tonney recently expressed willingness to be adopted.
 V. A.
By P.A. 95-238 § 3, § 17a-112 was amended to require a termination finding that DCF has made reasonable efforts to unify the children with the mother or that reasonable efforts at reunification were not possible. Although the amendment was CT Page 9454 ambiguous on the standard of proof, the court finds on clear and convincing evidence that such efforts were made to no avail, and that on January 14, 1993 DCF was excused from further efforts. Because of the mother's attitude, such reasonable efforts are not possible.
 B.
The court finds by clear and convincing evidence that over an extended period of time which is not less than one year:
1. The three children have been abandoned by the mother in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of there children. § 17a-112 (b)(1). This ground is fact based on the conduct of the parent. In re Kezia M.,33 Conn. App. 12 (1993).
2. The three children having been found in a prior proceeding to have been neglected, the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, the mother could assume a responsible position in the lives of these children. § 17a-112 (b)(2). In re ChristinaV., 38 Conn. App. 214 (1995); In re Joshua Z., 26 Conn. App. 58
(1991).
The court does not find clear and convincing evidence that:
1. The children have been denied by reason of act or acts of commission or omission by the mother the care, guidance or control necessary for their physical educational moral or emotional well being. Whether custodial or not, there must be specific acts causing serious physical or emotional injury to the children. § 17a-112 (b)(3). In re Kelly S.,29 Conn. App. 600 (1992); In re Sean H., 24 Conn. App. 135, cert. denied218 Conn. 904 (1991).
2. An ongoing parent-child relationship exists, as positive aspects of the emotional relationship survive the removal, even though based on fantasy. In re Jessica M., 217 Conn. 459 467-472 (1991). Like some children of divorce, these three children have not fully abandoned the fantasy of a prior family life.
VI. CT Page 9455
 A.
Having found adjudicatory grounds, the court must now consider and make written findings on seven elements. § 17a-1
12(d). In re Christine F., 6 Conn. App. 360 (1986). The court has considered the factors and makes these additional findings to supplement the facts previously found in this memorandum:
1. DCF offered timely and appropriate services to the mother and these three children, including parenting classes, individual therapy, visitation, phone contact and transportation. Even after the 1993 termination finding on reunification, DCF encouraged visitation as a possible prelude to more extensive efforts at reunification.
2. The efforts in paragraph 1 above were reasonable.
3. There were no applicable court orders entered into and agreed upon by the parties. Expectations were set forth in December 1990. As of October 1992 the mother was not in compliance. She failed to visit on a bi-weekly schedule. At some period, she did enroll in parenting classes and family counselling. She failed to provide a stable home situation suitable for children. See Termination Studies May 15, October 23 and December 16, 1992.
At each contact by DCF with the mother, she was reminded about visitation, and individual and parenting classes.
The current expectations are the mother would visit her children and would initiate any reunification efforts. She has failed to do so.
4. The children still have emotional ties with the mother. They also developed significant emotional ties with foster parents.
5. See Text.
6. The mother has filed to adjust her circumstances, conduct or conditions to make it in the best interest of the children to return them home in the foreseeable future. The mother has not maintained reasonable contact with her children or with the foster parents. The mother did not inquire of the foster parents CT Page 9456 about the condition of her children.
7. The mother has not been prevented from maintaining a meaningful relationship with the three children by an unreasonable act or conduct by any person or by her economic circumstances.
 B.
Upon clear and convincing evidence, the court finds that termination of parental rights is in the best interest of these three children. § 17a-112 (j).
The attorney/guardian ad litem of the children supports termination.
A child needs the certainty of permanence. For the sake of these children it is time, if not long overdue, to provide a possible foundation for a permanent home. Termination allows the option of adoption instead of long term foster care with the risk of foster care drift.
 VII.
Accordingly, it is ordered that the parental rights of the mother in Tonney, Oscar and Ginger be and they are, hereby, terminated. The Commissioner of DCF is appointed statutory parent for the three children and shall report to the court in accordance with § 17a-112 (i).
SAMUEL S. GOLDSTEIN JUDGE TRIAL REFEREE